**CROWDER et al. v. UNION NAT. BANK OF HOUSTON. (No. 8255.)**

(Court of Civil Appeals of Texas. Galveston. Nov. 28, 1922. Rehearings Denied Feb. 1, 1923. Cause Reinstated March 1, 1923. Dissenting Opinions Filed and Questions Certified to Supreme Court, May 4, 1923. On Final Rehearings, July 1, 1924.)

1. Homestead ⬉162(1)—Homestead character held impressed on land.

Land purchased with intention of making a home thereon *held* impressed with a home-

stead character on the date of its purchase, and to continue to be so impressed, though owner was temporarily living elsewhere, until the conveyance to another to divide the land between owner and his wife.

On Motion for Rehearing.

2. Homestead ⬉181½—Evidence held not sufficient to show abandonment as a matter of law.

Where land was impressed with a homestead character by husband and wife, and was conveyed by them to a trustee to make partition between them, evidence *held* not sufficient to show abandonment of homestead, in land conveyed by the trustee to the husband, as a matter of law.

Pleasants, C. J., dissenting on appellee's motion for rehearing. Graves, J., dissenting from overruling of appellant's motion for rehearing.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Suit by the Union National Bank of Houston against H. B. Crowder, Sr., and another. From a judgment for plaintiff, defendants appeal. Reversed and remanded on rehearing.

For Supreme Court's answer to certified questions, see 261 S. W. 375.

Presley K. Ewing and Ewing Werlein, both of Houston, for appellants.

Andrews, Streetman, Logue & Mobley and M. E. Kurth, all of Houston, for appellee.

LANE, J. This is a suit in trespass to try title, brought by the Union National Bank of Houston against appellant H. B. Crowder, Sr., and his wife, Edna Crowder. The petition of the plaintiff is in the usual form of petitions in simple trespass to try title suits. The suit is to recover title to 80 acres of land, the east half of 160 acres described in the petition. The defendant H. B. Crowder, Sr., and wife pleaded a general demurrer and the statutory plea of not guilty.

The title asserted by the plaintiff to the 80 acres of land sued for is as follows: The 160 acres, of which said 80 acres is a part, is in Harris county, Tex., and was purchased or traded for by H. B. Crowder, Sr., the husband of Edna Crowder, on the 7th day of March, 1916, and became the community property of the defendants, H. B. and Edna Crowder. On the 8th day of August, 1917, defendant Edna Crowder separated from her husband, H. B. Crowder, Sr., with the intention of obtaining a divorce; and on the same day H. B. Crowder, Sr., and wife conveyed the west half of the 160 acres, upon which they had never actually resided, to one O. L. Miller, trustee, for the use of Edna Crowder, and the east half thereof to said trustee for the use of H. B. Crowder, Sr., for the purpose of making a partition and division of their com-

munity property. On the next day, August 9, 1917, O. L. Miller, as such trustee, conveyed the west half of said 160 acres to Edna Crowder, and the east half thereof to H. B. Crowder, Sr. On the same day, August 9, 1917, Edna Crowder filed suit against H. B. Crowder, Sr., for a divorce. At the time of such separation defendants were, as they had been since they left their former home in Waller county, living on 540 acres of land belonging to C. R. Crowder,·a brother of H. B. Crowder, Sr., situated about two and one-half miles from the 160-acre tract owned by them. After the separation, Edna, the wife, moved to the town of Katy, in Harris county, and engaged in a restaurant business, and H. B. Crowder, Sr., moved to Dayton, in Liberty county, and began to live with his son by a former wife. On the 31st day of July, 1918, and before H. B. Crowder, Sr., and wife had actually resided upon the 160 acres, a writ of attachment was sued out by the plaintiff bank, and the same was executed by levying on the 80· acres of land conveyed by Miller to H. B. Crowder, Sr., as the property of said Crowder, Sr., on the 17th day of September, 1918. Judgment was thereafter rendered in favor of the bank against H. B. Crowder, Sr., for a large sum, and the attachment lien was foreclosed on the said 80 acres. Thereafter said 80 acres was sold by the sheriff, under an order of sale, to the plaintiff bank.

The defendants' contention is that, when they purchased the 160 acres of land, it became, by certain acts of dedication, their homestead, and that it had been such homestead at all times since, and that the sale by the sheriff to the bank conveyed no title; that as the divorce suit was dismissed by Edna Crowder, and no divorce granted, there was no abandonment of any part of the 160 acres as defendants' homestead by either of them by reason of said partition deeds or otherwise, but the same has continued to be their homestead at all times.

They also contend that, if the conveyance of the east half of the 160 acres to H. B. Crowder, Sr., constituted an abandonment thereof by Edna Crowder as a part of her home, it nevertheless remained and continued to be the homestead of H. B. Crowder, Sr., and therefore not subject to forced sale for the payment of his debts, and that in no event did the bank get title to said 80 acres by· the sheriff's deed.

It is shown that prior to the 7th day of March, 1916, the defendants owned a home in Waller county, Tex., upon which they lived with their family, consisting of several children; that on said date they traded said home for the 160 acres situated in Harris county, hereinbefore mentioned; that said 160 acres was improved; that it was entirely inclosed with a fence, a part thereof for farming purposes and a part for pasture;

that there was a dwelling house and two outhouses situated on the west half thereof at the time defendants became the owners of the same; that the dwelling house was a two-story frame house with two rooms upstairs and five below; that the two outhouses were barns. It was shown that C. R. Crowder, a brother, owned 540 acres of land in Harris county, and that in going from the former home of appellants to said 540 acres one would have to pass by the 160· acres owned by appellants.

It was shown that H. B. Crowder, Sr., and wife separated and that the wife filed the divorce suit as above stated, and that they conveyed the 160 acres of land to O. L. Miller in the manner and for the purposes above stated, and that in said deed it is recited "that, whereas, H. B. Crowder, Sr., and his wife, of Harris county, Tex., have separated, and she has brought suit against him for divorce, and they are desirous of making a division of their community property, real, personal, and mixed"; and then follows a recital that, in consequence of the premises, they convey the 160 acres to O. L. Miller in the manner and for the purposes as already shown; that O. L. Miller then conveyed the west half of said land to Edna Crowder, and the east half to H. B. Crowder, Sr. The levy of the attachment and the sale of the ·east half to the bank under the order of sale, as asserted by the bank, is also shown.

It is also shown that, when the defendants moved from their former home in Waller county, they moved upon the 540 acres owned by C. R. Crowder, and that they continued to live on said land until their separation on the 8th day of August, 1917; that they never at any time actually lived on the 160· acres until on the 28th day of November, 1918, several months after the levy of the aforesaid attachment. It is further shown that, at the time of their separation in contemplation of a divorce, the defendants divided all their personal estate, consisting of cattle, horses, hogs, farm implements, and household and kitchen furniture.

After such separation, Mrs. Edna Crowder, with some of their children, moved to the town of Katy, and conducted a restaurant business, and H. B. Crowder, Sr., went to live with his son by a former wife, who lived in Liberty county, Tex. Shortly after said separation H. B. Crowder, Sr., took one of the children, a boy, who was to remain with him, to Oklahoma, and placed him in school. On the 19th day of September, 1917, about six or se'ven weeks after said separation and division of the defendants' community property, H. B. Crowder, Sr., by his deed of that date, conveyed to J. S. Crowder, his son by a former wife, the 80 acres involved in this suit, for a recited consideration of $5,200. On August 21, 1918, J. S. Crowder conveyed said 80 acres to C. R. Crowder,

brother of H. B. Crowder, Sr., reciting a consideration of $5,200. The suit for divorce filed by Mrs. Edna Crowder was dismissed on the 26th day of December, 1918.

The defendants have owned no land other than the 160 acres since they disposed of their homestead in Waller county in March, 1916. When they left their Waller county home they moved upon the 540 acres owned by C. B. Crowder and lived there from that time until their separation, on the 8th day of August, 1917. With reference to his intention with respect to the 160 acres and acts preparatory to using the same as his homestead, H. B. Crowder, Sr., testified in part as follows:

"After I left my land in Waller county, I put my son on this 160 acres, and this other man, and I put some ploughs and beds and stuff there. I used it all the time. I moved my boy there until he went to the army. I intended to use that 540 acres temporarily. Then I intended to go back home there, to this home there that I had; that is, this 160 acres; that was all I had.

"In addition to putting the boy there, I left some cattle there and some horses, ploughs, hoes and rakes, hay outfit, and an incubator, and bought some paint and painted the house. I did lots of other things in preparing for the use of the place that I bought. I think that year and the next year I must have put $300 or $400 worth of improvements on it, fencing it and fixing it up. That was for homestead purposes. After selling my home or trading it in Waller county, I traded for this land there for my home.' There was a good house on it, right close to town. I had some little children to send to school. It was my home, this 160 acres. My intention was to make it my home; that was my purpose. I put that man there on the place to help farm the land, him and my son. He was to be there for just the one year 1916. I did not live on that place at that time myself—actually live there. I just had a room, me and my wife kept a room, reserved a bed for our own use, and this incubator, the lady had chickens on one-half. We furnished the eggs and the chickens and everything. These chickens which I had there, I had there for homestead purposes. I painted the house because it was my home; it was all the home I had. I reserved that room there in the house because I would go back and forth there to work and I had a pasture there, put cattle there. I was not going to keep no stock in there, only we owned, you know, going backwards and forwards. This cattle were cows, some calves and yearlings, such things as that; domestic cattle. The horses were plough horses and mules, such things as that, one thing and another. * * *

"My boy and this fellow made a crop there on the place. I had an interest in the crop. * * * My object in leaving these ploughs and things I left there was because I was going to move back there as soon as I went off. I had to give up my brother's place, you know. I didn't know what minute he would sell. * * *

"We had an orchard there for our own use and reserved, my wife did, one-half of the orchard. I don't think she had any garden. We used those chickens for home use. We built a fence. That was for the purpose to use as a home, in connection with our home use. We had on there, I believe it is a two-story house—frame house. I think there's, let me see—there's two rooms upstairs, I think, and five downstairs, five on the ground floor and two up. I painted it in June or July, 1916; I think that was it; it was one of those months, 1916, it was either June or July. * * *

"Since leaving the Waller county homestead, I have not acquired any other homestead than this 160 acres. That is all the land I have ever owned; that is the only land I have. I have no other homestead. I claimed that home was mine ever since I left Waller county; that is all I ever had. That is my intention. That is my permanent home. * * *

"We have not been right on this property all the time. We have had it in our possession. We have had these things on it all the time, never has been clear of our stuff. We have had this bed and bedding and cows and horses on there all of the time; never has been clear of our stuff—ever since we bought it; after March, 1916. We never have taken those things off. There is no fence that separates the east one-half from the west one-half; it is all right under that same fence that it has always been; all, being used in the same way. * * *

"It was on the 28th, on Thanksgiving day, 1918, when we moved back; that is actually went on it. During all the time I had not been on it. I had that property I described, on it all that time; it is there yet; never has been off. I had not acquired any other homestead during that time; never have done it. During all that time, my intention was that, that 160 acres was for my home. The pigs, horses, cattle, and chickens, and things of that kind, described in that deed to O. L. Miller from my wife and myself, where he partitioned the things between us, were all there for our home use. They were actually on this place and were kept there all the time. After this partition between us, I think the biggest part of them did continue there, what they didn't eat. If they ate them they were for home use; we never sell nothing like that. We eat them. * * *

"With reference to whether or not all I did was to come by and leave these tools. Oh, I was there all the time, going backwards and forwards. I had to stop there on it. I had the stock there on it all the time until she came down here and made up for this separation. * * * It is a fact that from the time we moved—first moved to Harris county, until after 1918, we neither one of us lived on this 160-acre tract—not permanently; we had these things there, but we did not live on it. Neither one of us lived there. It is further a fact that during all the time, at least up to until November 28, 1918, we had this place rented out; got a part of the crops off the place, but then I kept the pasture and things there for my own use. * * *

"With reference to all that I ever did, at least up to November, 1918, at the time I say I went back from Katy, and moved on the 160-acre tract, with regard to the 160-acre tract, was that I went by there, and left the ploughs and farming implements, and that I had some chickens and some cattle on the place, and that I left some paint there, bought some paint and carried it there; painted the house. I had the

placed farmed all the time. I rented it out and this boy was on there, that is what I told you, until he was drawed to the army. * * *

"I can be living there and be down there temporarily. I was there on that 540-acre tract just temporarily. I taken charge of it; I got rid of those cattle; I had a bunch of cattle, I got rid of them and was going to move on my own place. I was just keeping it there for my brother; I am still keeping it for him. My intention about a permanent home at that time was my own land; my home where I am living now; that was all I ever had; the other was just temporarily. Those trips down to Dayton were just temporary livings, going back and forth. * * *

"With respect to these acts, preparatory to making this a homestead, my object in painting it was to take care of and preserve the house as my home. That was a preparation to use the place as my homestead.

"Some of those cattle that were on there were milch cows and stock cattle, like I had about 500 or 600 head. You know about how cattle are. They were for home use and to sell; just like all other fellows get broke. I used the milk. The room that I had there was because I wanted a room, so that if my brother came down there, or if I had to go up to my place, why I was on my own. I have retained that possession all the time; been there ever since I bought the place; ever since 1916. No man ever had possession of it. The reason I sent those household things, those beds and all, to this 160-acre place, was because it was my home. I sent them there for that purpose; to use it as my home. I did not fence that 160-acre place, it was fenced when I traded for it. I fixed the fence up, kept it up; patched it up; it was all under fence. I was keeping up the fence because it was my home; to keep it in shape to live on; I expect to live there until I die. * * *

"Those things that I did do were acts of preparation to use the place as my homestead. I can answer the question in this way, why if you want me to. I done all the work I done on it for my home; I expect it to be my home as long as I live."

With reference to her intention, etc., with respect to the 160 acres, Mrs. Edna Crowder testified in part as follows:

"The 160 acres down here near Katy, in Harris county, which Mr. Crowder bought, was a trade for the home in Waller county. * * * We traded the home in Waller county for this 160 acres in Harris county for the purpose of using it for our home to live on. We moved to Harris county somewhere I think it was, about the 25th of March, 1916, from Waller county. We moved down to Harris county our household effects to be used there, to reside there, live there, keep our home there. We moved them down to use them for home purposes. When we first came down we moved out on that 540-acre tract, lived out there with my husband. Part of our household effects, saddles and chickens, we took down to what we called the Delhi place, the 540 acres, and part we left on the 160 acres. We had to pass by the 160 acres in order to get to the 540 acres. We left them there to prepare our home, to live there, to move there. We did not go to this Delhi place to stay there permanently; we were just going to stay there temporarily. * * *

"Well, as we passed by we left some few pieces of furniture and hunting implements and mowing machine and some ponies and cow ponies and some dry cows, that we were going to take, and I also left my incubator for the woman that was keeping the place. She and I raised chickens on the halves and she was to pay off half. I think about June or July Mr. Crowder and one of the boys went up there and painted the house over, the whole house on the outside. We did not paint it on the inside, but we were going to later on, and we bought wire and repaired the pasture fence, and we screened in the sleeping porch, and we made what us cattle people call a wind-brake for cattle around the north and east side of the lots, for protection of the cattle in the winter, and we floored a couple of buildings—old buildings—we wanted one to put cotton seed in and one for grain and several other things we had, little things preparatory to, of course, making our home as pleasant and comfortable as we were able to, at a time we were able to go there. These preparations were absolutely made for home uses and purposes; these improvements were open and visible. While we were temporarily absent from it, we had Mr. and Mrs. Bootsky and our son, one of our boys, in possession of it. My son was there from the time we moved down past there. You know, that is why I left him there, to look after the place, and to see that nothing was damaged or injured in any way; that everything was taken care of because I was born in a home of my own and I am kind of silly about a home of my own. Among the neighbors and in that neighborhood my claim of homestead was made open and generally. * * * After making those acts of preparation that I claim to have made, I never formed the intention of not again occupying this place as my home. I always intended to occupy it as my home. I never intended not to. During all this period I did intend to occupy it. * * *

"This renting out of the place was intended to be just temporarily. I rented the place that I rented up at Katy, for temporary uses until I could get the farm."

She further testified:

"I said that while I lived at Delhi I stayed there (on the 160 acres) quite a few times at night. While I lived at Katy I did not have any occasion to go down there or spend the night there; I never spent the night; I went right there in the pasture when the new calves would come, I would go out and look at them, and when I needed a new cow at the restaurant I would drive out to the pasture and take a new cow to town, and I was down there lots and lots of times."

With respect to the question of abandonment, the appellant H. B. Crowder, Sr., testified, substantially, that since leaving his Waller county home he had not acquired any other homestead than the 160 acres, and that he intended to make said 160 acres his home when he traded for it, and that he had never abandoned such intention. Testifying further, he said:

"On August 9, 1917, my wife, Edna Crowder, brought suit against me for divorce. No papers were ever served on me in that case. That suit was dismissed because we fixed it up and agreed to go back together in about three or four weeks. There was no suit to it; we went back together. I stated that no papers were served on me at the time she brought that suit. With reference to whether or not I expected her to get a divorce from me, well, when she quit that morning and went off, she said she was going to get one. I knew she would not get any divorce; she would get in a good humor directly. I did not feel like she was going to get no divorce. I told her that. I told Judge Boyd so. I knew she would come back just like we had been all the time. That is what I expected her to do. We agreed to go back some time in October after the suit was filed; it may have been the 1st, or it may have been the 10th or the 15th, right soon after it was over, she come down here and applied for that. We have lived together as husband and wife ever since.

"We have not been right on this property all the time; we have had it in our possession. We have had these things on it all the time; never has been clear of our stuff. We have had this bed and bedding and cows and horses on there all of the time; never had been clear of our stuff; ever since we bought it; after March, 1916. We have never taken those things off. There is no fence that separates the east one-half from the west one-half; it is all right under that same fence that it has always been; all being used in the same way. There's nothing on the east half only this, I built a little house after she went down there, and since they give her 80 acres and me 80 acres, I built me a house there so I was going to have me a home. This little boy that I am telling you about, I believe he was eleven years old at that time; why he was going to stay with me, and he did stay with me all the time. I put him in school. That was my home—all the home I had—if she had got a divorce, but she never did get one. We fixed it up and went back together, and I never have been in that house. If she had gotten the divorce I would have been staying right there now. The rest of the children lived with her. * * *

"If the divorce had been granted, I would have occupied that house I built, with the little child and perhaps two of them, and I would have been the head of that house. I did not think she was going to get no divorce; she was mad when she come down and I thought she would get in a good humor in a day or two and it would all be over; that is just what I thought. We had been living together as husband and wife before that for twenty years. * * *

"With what I intended with respect to those 160 acres at that time: Well, after me and her agreed to divide it that way, get Mr. Miller to divide it, why this 80 was my home and that would be her home if she got a divorce, but I was not looking for any divorce. At that time I moved to Dayton; I moved there to stay there temporarily. I was going to return back to those 160 acres when I took this house as my home. At that time my wife was running a restaurant there in Katy. She was running a restaurant up there and I would go back and

forth down there. At this time I had this boy Wallace, I had put him in the college there at Oklahoma. The other children were going to school there in Katy. That is where Mrs. Crowder had that restaurant. She was staying there at Katy, because she wanted to send those children to school, and she rented this place after she had went off down there, rented this place to a man by the name of Bolay, Mr. Pillot's nephew here, and we could not get possession of it until the 28th, I think, of November and then we moved back on it. It was my intention right after I made up with Mrs. Crowder to go back home; to go back and claim all of it as my home, the 160 acres.

"With reference to what my intention was before I made up with her, all the time, if she didn't get a divorce: Well, of course, if this here court would have given her that 80 acres, this other was mine and it would have been my home, but I claimed the whole 160. I was going to claim 160 acres if she did not get no divorce, so it would all be together in one tract and our home. * * *

"It was the 28th day of Thanksgiving day, 1918, when we moved back; that is, actually went on it. During all the time I had not been on it, I had that property I described on it all that time; it is there yet; never has been off. I had not acquired any other homestead during that time; never have done it. During all that time my intention was that that 160 acres was my home. The pigs, horses, cattle, and chickens, and things of that kind described in that deed to O. L. Miller from my wife and myself, where he partitioned the things between us, were all there for our home use. They were actually on this place and were kept there all the time. After this partition between us, I think the biggest part of them did continue there, what they didn't eat."

On cross-examination he testified in part:

"With reference to why I came down and executed this deed conveying her half of it: Well, she was mad, said she was going to get one; she done it herself. At the time I executed that deed to Mr. Miller, our trustee, which was the same day, I believe, she was still mad. I was not a bit more mad than I am right now. Sure I mean to tell this jury that I came down and executed a deed to half of my property and wasn't mad, because I knew the children was going to get it—those kids. I never was mad at her about it at all. She will tell you that herself. That is the reason I did not think she was going to get no divorce."

He also testified:

"At no time, from the time I bought the land up until my wife and I disagreed, did my wife or I live on the land. I think she left the 540-acre tract on the 8th of August, 1917. That is the time we executed these partition deeds. From that place she went to Katy; and I went down yonder like I told you, to Dayton. Neither one of us at that time was living on the 160-acre tract. I stayed at Dayton, I reckon, I may have stayed there five or six months. I don't know. I would go backwards and forwards from there to Katy all the time."

· He also testified:

"I executed a deed to this land to my son, J. S. Crowder. I just conveyed that land to my son, J. S. Crowder, this way; that if my wife quit me any more, I would always have my home. He never gave me a nickel in the world for it, he never paid me a cent; it was my home. She did not know nothing about it, at the time we agreed to go back, when I deeded him the home, I will explain it all to you."

With respect to his intention, Mr. Crowder also testified: ·

" * * * My intention about a permanent home at that time was my own land; my home where I am living now; that was all I ever had, the other was just temporarily. Those trips down to Dayton were just temporary livings, going back and forth."

He further testified:

" * * * This renting to Bootsky or one or two other people was not to make a permanent disposition of my place. I just rented it to him and used my home, and when I got ready to go back on it, it was all the home I had. I never rented no land nowhere to work, or worked anywhere in my life; always had my home. * * *

"During that time of all this moving around I did not acquire a home anywhere else. I did not at any time leave that place after once acquiring it with the intention of not returning to it. Of course I intended to go back home. I never did abandon it; it is always my home. With respect to the renting of the place, and whether or not I intended to rent it permanently or just temporarily, I just rented it free; what land they could work; and the other part we kept in our possession so we could keep stock on it all the time. After the expiration, I intended to go on it just as soon as I could get through with my 540."

On cross-examination he testified that he might have stayed at Dayton, with his son, six months, but during this time he visited Katy several times; that he did not remember his testimony, as to where he lived, on the trial of the case of the bank against him on the 17th day of September, 1918; that if he testified that his reason for conveying the 80 acres conveyed to him by O. L. Miller, trustee, was that he had no home after the separation of himself and his wife, and that he was put out of doors, and that the consideration to be paid by his son was to give him a home and take care of him, he did not remember it, but he does remember that he told his son that he would build a house on the 80 acres, that it was his home, and that he and the little boy awarded to him would stay there.

The witness was asked, if on the trial of September 17, 1918, he had not testified that the only consideration for the conveyance of the 80 acres by him, to his son, J. S. Crowder, was that his son give him a home. To this question he answered that he could not say. He was then asked if he had not testi-fied on said trial in September, 1918, that he figured out that he did not know how long he would live, and so informed his son, and that the son said, "You know I will take care of you;" and that on receiving such assurance from his son he deeded the said 80 acres to him. In answer to this question he said: "I· don't remember; * * * I will not state that I did or did not. I would not say either way." He also testified that if he had testified at said September trial, that he had been living with his son, J. S. Crowder, at Dayton ever since his wife left him, and was at that time (September 17, 1918) living with said son, such statement was untrue, because as a fact he lived backwards and forwards at Dayton and Katy all the time.

O. L. Miller testified:

"I separated the stuff, and she moved her stuff or some of her stuff up to the restaurant and started running it. I mean the furniture, her part of the personal property; her furniture was moved up there. She moved her furniture and stuff up to the restaurant. With reference to what Mr. Crowder did with his: They were on the place, you see, the cattle and all the stuff; that little dun mare and the outfit, they were still on there."

With respect to intentions of filing the divorce suit and as to what appellants then did, Mrs. Crowder testified as follows:

"On the day that I filed that suit, it was my intention then to separate from Mr. Crowder. I just told you I did do that. I moved to Katy, away from the Delhi place, at that time. We were living at Delhi when I filed the suit for divorce. I never at any time lived in Dayton. I knew this son in Dayton—near Dayton. I left him at Delhi. I left Mr. Crowder at Delhi when I left him. Later I found that he had moved down there. I heard that he had moved down there. I don't know how long he stayed down there; he was down there backwards and forwards. After he left Delhi and I moved to Katy, it was about a week, I guess, before I heard that he was living at or near Dayton with his son. I don't know how long he stayed down there; I don't know when it was when he came back. I saw him passing backwards and forwards, and after he came to the restau⁻ rant, after we had made friends, why he was there every two or three weeks, go off and probably a couple of months before he would come back. After we had separated, after he had moved down to Dayton, he came back to stay occasionally. I don't know how long he would stay, when he came back there. I did not take any notice of how long he stayed; sometimes he would stay three or four days, and sometimes a day, and sometimes a week. I do not know how many times he came back there before we finally moved onto the place; I haven't any idea at all. It seems like it was quite a number of times to me. I know once he came there, and then he and I went to Oklahoma together while he was living at Dayton or near Dayton. After coming to Katy, I don't know how long he would stay in Dayton after he would return there. I cannot approximate the time. I did not know what he was doing while

he was down there; I did not know where he was. He had a son lived down there near Dayton, between Dayton and Liberty, a son by a former wife. That son of his is not my son, but a stepson. That was a child by a former marriage. They said he was down there at Dayton with this other son of his. He told me so. He was farming and raising cattle, looking after his farming and cattle down there. I positively could not say whether it is a fact that my husband stayed down there at or near Dayton for a year or was down there off and on for a year. I could not tell you when he left Dayton with his belongings to reside at Katy. It was somewhere around ten or eleven, and could have been twelve, months when he brought his belongings back to Katy. I really could not tell you; I did not pay any attention to it. I think it was something like, or around or about, twelve months before he brought his belongings back to Katy; but he was back and forth all the whole time. They said he was farming down there during that time. I don't remember of ever asking him what he was doing down there; that is what Madame Rumor said he was doing, farming and cattle raising. I do not ever remember asking him what he was doing down there, all that time when he would go back and forth. I had too much business of my own up there. That was while I was running the restaurant up there in Katy. * * *

"Right at that day that I filed the suit for divorce, I intended not to live with Mr. Crowder any more. I did move away with the intention of living at Katy until I could come back and get the house and land from the tenant. I intended to live in Katy, and run the restaurant, and keep the little children in school until I could get possession of the farm. The next day after these deeds were executed, I immediately moved to Katy. I don't know whether I changed my mind about living with him any further the next day or not. When I filed the divorce I didn't intend—I did intend to stay separated from Mr. Crowder—I was insane with anger that day."

G. C. Simmons, official court reporter, testified that he acted in his official capacity in the case of the Union National Bank of Houston v. H. B. Crowder, Sr., et al., in September, 1918; that H. B. Crowder, Sr., testified as a witness at that trial. Testifying further, he said:

"I have with me this morning my original notes, taken on the trial, of the testimony; that is, the testimony of Mr. H. B. Crowder, Sr. I have an exact duplicate copy of this, which I prepared for Mr. Kurth. The following question was asked Mr. Crowder by the court: 'What became of those cattle?' Mr. Crowder's answer was: 'I can explain this way: When me and my wife separated, she came down here and brought suit against me for divorce. Well, my little girl had five or six milch cows that she always claimed. Well, I gave her those cattle, and my son had all the rest of those cattle when I left and goes down to this son down here. I came down here and divided the estate.' This question was asked him: 'When you were down here, to which one was it you went?' Answer: 'Well, he was in Liberty.' Question: 'That was your son by your first wife?' An-

swer: 'First wife.' He made those answers. The following questions were asked him: 'How long has it been, Mr. Crowder, since you were back up here where your second wife lives; how long have you been since you have been up there, up to that time?' His answer to that question was: 'Oh, I hadn't been up there in over a year.' He was asked this question: 'What was you doing down there close to Dayton?' His answer was: 'I was living with my son.' This question was asked him: 'What was you doing there?' His answer was: 'Farming.' * * * This question was asked him: 'In the partition of the estate, community estate of you and she, between you and she, did she or her lawyer ever claim it, or any part of it, this R. E. and C. R. Crowder, as belonging to you?' His answer to that question was: 'No, sir.' This question was asked him: 'Now, Mr. Crowder, when you and your wife separated, how much land was allotted to you?' Answer: 'Eighty acres.' This question was asked him: 'What did you do with that eighty acres?' His answer was: 'Well, I gave it to my son at Liberty.' This question was asked by the trial judge: 'Right there; when was that separation, what year?' Mr. Graham answered that question. He said: 'Just a minute, your honor, I will refer to the instrument right here (which he does). The deed bears date August 8, 1917, H. B. Crowder and others to O. L. Miller. Was it about then Mr. Crowder?' His answer to that question was: 'Yes, sir; somewhere along about then.' This question was asked him by the trial court: 'Is that (meaning J. S. Crowder) your son?' His answer to that question: 'Yes, sir.' * * * This question was asked him by the court: 'Why did you convey that to him?' His answer was: 'Well, sir, I had no home. You see the court gave her the improvements and everything, and I was laid out of doors and he had the place and I said, "Jim, you are by my first wife; if you will take me and take care of me I will give you this 80 acres of land;" and he said, "I will do it."' This question was asked Mr. Crowder on that trial: 'Well, following the making of this conveyance, Mr. Crowder, to Jim Crowder, in consideration of which he was to give you a home, that was all the consideration paid?' To which he answered: 'Yes, sir, because I figured out I did not know how long I would live, and he says, "You know I will take care of you," and I just deeded it to him.' This question was asked Mr. Crowder: 'Following that, and in pursuance of that, have you been to his house?' His answer was: 'Yes, sir; ever since and living there now.' * * * My book shows that Mr. Crowder was put on the stand at eleven-thirty o'clock a. m., September 18, 1918, exactly. I always put the exact time that the witness was put on the stand. That testimony that I have stated was given at that time by Mr. Crowder."

The facts as above stated, together with the testimony as detailed, is, we think, substantially all the evidence with respect to the questions: (1) Was the evidence sufficient to require the trial court to submit to the jury the issues (a) as to whether the 160 acres had been impressed with the homestead character as the home of appellants; (b) after the 80 acres had been conveyed to H. B.

Crowder by O. L. Miller, trustee, was it impressed with the homestead character as the home of said H. B. Crowder by any act of his; and, (c) if it was so impressed, did he abandon the same before the levy of the attachment on the 31st day of July, 1918; these being, we think, the only issues in the case.

The case was tried before a jury. After the close of the evidence the defendants Crowder requested the court to give a peremptory instruction in their behalf, insisting that the property had become impressed with the homestead character, and that there was no sufficient showing in the evidence of abandonment. They also requested the court that, in event it should be held that they were not entitled to such peremptory instruction, then that the court should give to the jury the following special charge:

"Did the homestead character attach to the 160-acre tract in question; that is, did same become the homestead of the defendants, prior to the levy of the attachment in evidence? Answer 'Yes' or 'No.'

"You are instructed as explanatory: Property may become homestead previous to actual occupancy of it as such.

"If the 160-acre tract in question was acquired by the defendants with the intention of making it their home, and if this intention was manifested by such act or acts of preparation for it as their home, prior to the levy of the attachment in question, as amounted to reasonable notice of that intention, then the property became the homestead of the defendants, and continued as such unless afterwards abandoned as herein submitted.

" 'Intention' alone in such case would not be sufficient to impress the homestead character upon the property, but to have that effect, such intention must have been accompanied by such act or acts of preparation as amounted to reasonable notice of that intention."

The court refused both of such requests and instructed the jury to return a verdict in favor of the plaintiff. Verdict for plaintiff was returned by the jury, and judgment was accordingly rendered in its favor for the 80 acres of land sued for.

[1] We think the court erred in giving the peremptory instruction for the plaintiff. The undisputed evidence shows that the whole of the 160 acres, of which the 80 acres involved in this suit is a part, was impressed with the homestead character from the date of its purchase by appellants, and as a whole continued to be so impressed up to the date of the deed of date August 8, 1917, by which appellants conveyed the same to Miller. This was not an issuable fact. Cameron & Co. v. Gebhard, 85 Tex. 610, 22 S. W. 1033, 34 Am. St. Rep. 832; Archibald v. Jacobs, 69 Tex. 251, 6 S. W. 177; Dobkins v. Kuykendall, 81 Tex. 183, 16 S. W. 743; Barnes v. White, 53 Tex. 631; Davidson et al. v. Jefferson (Tex. Civ. App.) 68 S. W. 824; Miller v. Flattery (Tex. Civ. App.) 171 S. W. 253; King v. Wright (Tex. Civ. App.) 38 S. W. 530.

After the conveyance of the practically unimproved east half of the 160 acres to Miller, trustee, on the 8th day of August, 1917, the same was abandoned by appellants as a part of their home, and unless it had been impressed with the homestead character thereafter, and before the levy of the attachment, by actual occupancy or some act or acts of H. B. Crowder, Sr., showing an intention to make the same his home as the head of a family, it was subject to the sale made under the order of sale. Whether it had been so impressed was, we think, under the evidence, a question which should have been submitted to the jury.

We also think that, if it should be found that H. B. Crowder, Sr., had by his acts and intentions impressed said 80 acres with the homestead character, then, in that event, the court should have submitted to the jury the further question as to whether H. B. Crowder, Sr., after so impressing said 80 acres with the homestead character, thereafter and before the levy of the attachment, abandoned his intention to make the same his home. That H. B. Crowder, Sr., never actually occupied the 80 acres as his home, after the division deed of appellants was executed, is undisputed.

Admitting that less evidence may be sufficient to show abandonment, where the property had been only impressed with the homestead character, than where it has been constituted the homestead by actual occupancy as a home, still, we think, the evidence in the present case is such as required the court to submit to the jury the question as to whether this 80 acres had been abandoned by H. B. Crowder as his home after the separation of himself and wife and before the levy of the attachment, if it had in fact been impressed with the homestead character.

We have reached the conclusion that the judgment should be reversed and the cause remanded, and it is so ordered. In view of the fact that the cause is to be retried we have refrained from discussing the weight of the evidence.

Reversed and remanded.

On Appellee's Motion for Rehearing.

PER CURIAM.   Motion overruled.

PLEASANTS, C. J. (dissenting).   I was not present when this appeal was originally decided, and, upon examination of the record in considering appellee's motion for a rehearing, I cannot agree with the majority of the court in the conclusion expressed in the original opinion, nor in the disposition of the motion for rehearing.

I think the facts stated in the opinion of the majority, all of which are undisputed, conclusively show that the 80 acres of land in controversy in this suit was not the homestead of appellants and was not impressed with a homestead right in appellants at the

time the attachment, under foreclosure of which appellee acquired title, was levied.

It may be conceded, as held by the majority, that the 160 acres of land, of which the 80 acres in controversy is a part, and which was purchased by the appellants with the intention of making it their homestead, was impressed with a homestead character and entitled to protection as such so long as the acts and declarations of appellants were corroborative of, and consistent with, their claimed intention to make their home thereon, but this 160 acres, not being the actual homestead of appellants prior to the levy of the attachment, the 80 acres in controversy ceased to be entitled to protection as a homestead, when by their acts and declaration appellants repudiated and belied any intention they may have once had of making it their homestead. The right to acquire and hold property for homestead purposes and secure for it the protection that the Constitution throws around the home of a family without occupying the property, is firmly established by our decisions; but the limitations of this right, or rather the circumstances and conditions under which it is recognized and enforced by the courts, are also well established.

The rule, in a majority of the states, requires actual occupation of property as a home, as a prerequisite to impressing it with the homestead character. The liberalization of this rule by our courts was because of the obvious fact that otherwise one who was indebted or without means to at once build a home upon property acquired with the intention of making a home there, or one who was prevented by some reasonable cause from at once occupying property purchased for a home, might never be able to secure a home for a dependent family, and the benign purposes of the homestead provision of our Constitution would thus be prevented of full accomplishment. Franklin v. Coffee, 18 Tex. 413, 70 Am. Dec. 292; Stone v. Darnell, 20 Tex. 11; Gardner v. Douglass, 64 Tex. 76; Swope v. Stantzenberger, 59 Tex. 390; Archibald v. Jacobs, 69 Tex. 251, 6 S. W. 177.

In discussing this question and stating the circumstances under which property, not occupied as a home, will be given homestead protection our Supreme Court in the case of Cameron v. Gebhard, 85 Tex. 616, 22 S. W. 1035, 34 Am. St. Rep. 832, says:

"Intention alone cannot give a homestead right; but it is at the same time equally true that all other things combined cannot give it without the intention to dedicate it to the uses of a home. Valuable and costly improvements, coupled with long-continued possession, without the existence of a bona fide intention to make it a home, will not make it such. But the placing upon the premises unhewn logs for the purpose of erecting thereon the humblest cabin, with a bona fide intention to occupy as soon as the cabin can be built, secures the right. "From these decisions it is apparent that intention is almost the only thing that may not be dispensed with in some state of case; and it follows that this intention in good faith to occupy is the prime factor in securing the benefits of the exemption. Preparation—that is, such acts as manifest this intention—is but the corroborating witness to the declaration of intention, the safeguard against fraud, and an assurance of the bona fides of the declared intention of the party."

In the early case of Franklin v. Coffee, supra, in speaking of the character of the preparations and acts of the party necessary to make effective his declared intention to make the property his home, the court says that they must be of such character as "to manifest beyond a doubt" the intention to reside upon the place as a home.

Applying these well-settled rules to the undisputed facts of this case, it seems clear to me that the 80 acres in controversy was not impressed with a homestead character at the time the attachment was levied. Appellants had never lived on the property; but, conceding that the 160 acres was bought with the intention of making it their homestead, its homestead character, without its occupation as such, could continue no longer than their intention to so use it continued.

Can reasonable minds differ in the conclusion that the acts of appellants in conveying the 160 acres to Miller, and having him convey the 80 acres in controversy to the appellant H. B. Crowder, and the remaining 80 acres to Mrs. Crowder, with the avowed purpose of dividing their property in contemplation of a divorce, suit for which was instituted by Mrs. Crowder, and the conveyance by H. B. Crowder of the 80 acres in controversy to his son, was not only not corroborative of an intention to make the 160 acres the family homestead, but conclusively rebuts any such intention. The subsequent acts of the appellants, as shown in detail in the opinion of the majority, are equally inconsistent with any intention on their part to make the property their homestead.

The testimony of appellant H. B. Crowder that he thought all the time that his wife would abandon her suit for divorce, and that they would finally make their home on the 160 acres, is of no importance. His claimed intention to make his home on the property, after its partition and the filing of the suit for divorce by his wife, was conditional upon a future reconciliation with Mrs. Crowder. It seems clear to me that such conditional intention, which is contradicted and negatived by his every act in relation to the property, could not impress it with a homestead character.

An issue of a homestead right, in H. B. Crowder in the 80 acres in controversy, separate and apart from the homestead rights of both appellants in the 160 acres, cannot possibly arise upon the facts of this case. If any such issue could be made upon these

facts, it has been foreclosed by the judgment in the attachment suit in which H. B. Crowder was a party.

It is true, as argued by appellants, that the issue of estoppel is not in this case, appellee not having advanced its money on the faith of the 80 acres of land being free of homestead claim; but the integrity of the homestead exemption is involved, and when the evidence shows that the claimed secret intention to make the property a homestead is not only not corroborated by acts of the parties showing such intention and thus safeguarding against fraud, but, as we have before said, is conclusively contradicted, it is the duty of the courts to disregard such claimed intention.

The appellee bank was entitled to have its attachment lien foreclosed and to reap the benefit of that foreclosure. It may be that appellants need the 80 acres as a homestead more than the bank needs it, but they could only acquire it in the manner sanctioned by the law, and, not having done this, the courts cannot give it to them.

I think the trial court was correct in holding that plaintiff was entitled to an instructed verdict in its favor, and that appellee's motion should be granted, and the judgment of the trial court affirmed.

### On Refusal of Appellant's Motion for Rehearing.

PER CURIAM. Motion for rehearing refused.

GRAVES, J. (dissenting). On original hearing I agreed to the disposition made and Judge Lane's opinion then handed down; on rehearing, though still adhering to the conclusion that a reversal should be had, I became convinced that we erred in so far as we held that the 80 acres in question became abandoned, as a matter of law, by reason of the transaction to which the deed of August 8, 1917, to Miller related, and that the entire question concerning abandonment, as appellants contended on rehearing, was an issue of fact that should have been submitted to the jury; accordingly, I dissented at the refusal to sustain appellants' motion so insisting, but agreed to the overruling of that of the appellee which invoked an affirmance.

Since the whole matter has now been certified to the Supreme Court, I feel that an elaboration of these views is unnecessary.

### On Motion for Rehearing.

LANE, J. In our original opinion we held that 80 acres of land involved in the suit was, as a matter of law, abandoned by H. B. Crowder and wife as any part of their homestead before the attachment sued out by the bank had been levied thereon, and, so holding, we held, further, that the trial court should have submitted to the jury the sole issue as to whether the 80 acres so involved again became the homestead of H. B. Crowder prior to the levy of the attachment, and that, as the trial court refused to submit such issue, the judgment rendered in favor of the bank should be reversed and the cause remanded for trial upon such issue.

Appellants filed their motion for rehearing, and, pending said motion, we submitted to the Supreme Court the following questions:

[2] "(1) Conceding that the 160 acres for which Crowder and wife traded their former home was, by the acts of said parties, impressed with the homestead character and exempt from forced sale for the payment of the debts of the husband, was the 80 acres conveyed by C. L. Miller, trustee, abandoned, as a matter of law, by Crowder and wife as a part of their joint homestead?

"(2) Did the facts stated raise the issue as to whether the 80 acres conveyed to H. B. Crowder by O. L. Miller, trustee, thereafter continued to be impressed with the homestead character?"

The Supreme Court, in an opinion published in 261 S. W. 375, answered the first question in the negative and the second in the affirmative. We therefore correct our former holdings in so far as they are in conflict with the answers of the Supreme Court, and reverse the judgment, and remand the cause for trial upon the general issue of abandonment.

Having made the correction above indicated, the motion for rehearing is overruled.